SIXTH DIVISION

No. 1-09-3460

| | | |
|---|---|---|
| QUENTIN MORRISSEY , | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County, Illinois, |
| | ) | County Department, |
| v. | ) | Law Division. |
| | ) | |
| | ) | Nos. 06 L 5293 |
| ARLINGTON PARK RACECOURSE, LLC, | ) | Honorable |
| | ) | Eileen Mary Brewer |
| Defendant-Appellee. | ) | Judge Presiding. |
| | ) | |
| | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This is an appeal from an order by the circuit court entering summary judgment in favor

of the defendant, Arlington Park Racourse, LLC, in an action for premises liability. On June 13,

2004, the plaintiff, Quentin Morrissey, sustained injuries when the horse he was riding fell while

exiting a training track on defendant's premises. As a result of this incident, the plaintiff filed a

complaint against the defendant, alleging that defendant's negligent maintenance of the

premises, namely, permitting standing water and soap to accumulate on the asphalt next to a

training track exit, caused the plaintiff's horse to fall as the horse was exiting the training track

and resulted in the plaintiff's injuries. The defendant moved for summary judgment pursuant to

section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2002)),

contending that the ground conditions, which the plaintiff complained of, namely, the water and

soap on the asphalt, were open and obvious, so that the defendant could not reasonably be

1

expected to anticipate that the plaintiff would fail to protect himself against the danger posed by such an open and obvious condition. The defendant also contended that since riding a horse poses an inherent risk of danger, the plaintiff, a professional rider, had assumed the risks attendant to riding the horse on defendant's premises and that defendant therefore owed no duty to the plaintiff.

In arguing against the grant of the defendant's summary judgment motion, the plaintiff conceded that the hazardous condition was open and obvious, but contended that the deliberate encounter exception to the open and obvious rule applied to the facts of his case, so as to permit him to proceed with his cause of action. The circuit court disagreed with the plaintiff and granted defendant's motion for summary judgment. The plaintiff filed a motion for reconsideration but that motion was denied by the circuit court.

The plaintiff now appeals, contending that the trial court erred when it found that the plaintiff had failed to present a cause of action for premises liability. The plaintiff contends that the trial court erroneously concluded that as a professional rider, the plaintiff had assumed the inherent risk of riding a horse, thereby releasing the defendant from any duty to protect him from injuries sustained while riding a horse. The plaintiff also contends that the trial court erred when it refused to apply the deliberate encounter exception to the open and obvious rule to the facts of his case. Specifically, the plaintiff contends that if the court construes the evidence in the pleadings and depositions in the light most favorable to him, there remains an issue of fact as to whether the defendant could have anticipated that the plaintiff would proceed to encounter the known and obvious danger, *i.e.*, the wet and soapy asphalt exit, where, to a reasonable man in

the plaintiff's position, the advantages of doing so would outweigh the apparent risk. For the reasons that follow, we reverse.

## I. BACKGROUND

The undisputed relevant facts are as follows. The defendant owns, operates and maintains the Arlington racetrack park in the city of Arlington Heights in Illinois. The racetrack park contains two tracks, the main running track, used for races, as well as for training horses, and a smaller track used only for training horses. The smaller training track is a dirt track, with two exits, an east and a west exit. The west exit is a paved path that runs around the entire training track and through the stables, requiring much more time for a rider to take the horse to the stable and back. The east exit, on the other hand, is located immediately adjacent to the dirt training track and next to several horse stables where trainers keep their horses. The path leading from the training track to the east exit is composed of asphalt, so that a horse coming from a training track will immediately step off the dirt and onto the asphalt at the exit. In addition, because trainers wash the horses immediately after their training exercises, using hoses and faucets located on the stables about 50 feet away from the east exit, water runs from those stables, across the asphalt exit path. The water mixes with dirt accumulated on the asphalt from horses exiting the training track before it drains into a ditch next to the training track. On June 14, 2004, the plaintiff was injured when his horse fell on top of him while at this exit.

As a result of this injury, on June 12, 2006, the plaintiff, filed a complaint against the defendant, and several other parties associated with the defendant, who were subsequently voluntarily dismissed from this action and are therefore not party to this appeal. In that

3

complaint, the plaintiff alleged that despite its duty to keep the east training track exit safe, the

defendant "carelessly and negligently" caused and permitted this exit to remain in a dangerous

condition, by: (1) permitting an "unnatural amount of water to accumulate at the said exit"; (2)

failing to remove the water; (3) failing to make a reasonable inspection of the aforesaid premises

to prevent the accumulation of water; and (4) failing to warn the plaintiff of the dangerous

condition of the said exit. The plaintiff contended that as a direct and proximate result of the

defendant's negligent maintenance of the premises, on June 14, 2004, he was injured when the

horse he was riding through this exit "slipped and fell."

On August 17, 2006, the defendant filed its answer and affirmative defenses to the

plaintiff's complaint, denying all the allegations therein. The defendant also raised four

affirmative defenses, including (1) that the plaintiff had contributed to his own injuries; (2) that

the plaintiff had assumed the risk of his injuries; (3) that the injuries were caused by an

intervening/superceding cause and not by the defendant's negligence; and (4) that the action was

barred by the statute of limitations.

During discovery, the defendant first produced an investigation report detailing the June

12, 2004, incident, completed by racetrack security guard Mike Rolsky, immediately after the

incident. According to that report, at about 8:26 a.m., on June 12, 2004, Tony Haynes, the

training track outrider[1], called 911 to seek assistance for "a rider down near a barn." Rolsky

---

[1]The record reveals that an outrider is a form of security at the training track and that he

is always inside the training track on his own horse. It is the duty of the outrider to help a rider if

a horse "goes crazy," and needs to be reigned in, or if it throws a rider to the ground.

noted that soon thereafter medical services arrived at the scene and examined the rider, who was identified as the plaintiff. It was determined that the plaintiff sustained a broken femur and he was transported in an ambulance for treatment. According to Rolsky's report, in describing what he had seen, the witness, Haynes, told Rolsky that "the horse reared up and the rider went down, and the horse fell on him." Rolsky also noted that the conditions were "wet" on the day of the incident and that the plaintiff is "a former jockey" and that he has "broken his femur numerous times before."

Subsequently, the parties made their mandatory witness disclosures pursuant to Rule 213(f) (210 Ill. 2d 213(f)), and the following six witnesses were deposed: (1) the plaintiff; (2) Javier Barajas; (3) Janice Ely; (4) Anthony Petrillo; (5) Dr. Eugene Lopez; and (6) Tim Koertegen.

### A. The Plaintiff

The deposition of the plaintiff was taken on September 12, 2007. The plaintiff, 35, is a rider who exercises horses, but not a jockey. He stated that he is originally from Ireland, but that he moved to the United States in 1992 in order to ride horses. Although the plaintiff has never been directly employed by the defendant, he has worked as a horse rider for different trainers and companies that use the Arlington racetrack since 1992. In the past 10 years, he has trained horses at the Arlington racetrack "thousands of times."

On June 14, 2004, the plaintiff was employed by two trainers, Mike Reavis and Tim Koertegen.[2] Reavis trained horses at the Arlington racetrack, while Koertegen trained them at

---

[2]The plaintiff had been employed in this capacity by both trainers since 2001.

Horizon Farms in Barrington, Illinois. The plaintiff's job was to exercise and train horses by riding them daily according to the instructions he received from the trainers. The plaintiff only rode Thoroughbreds, but the horses he rode for Reavis were generally older.

The plaintiff stated that his day consisted of two shifts. He would spend his morning, at the Arlington racetrack riding Reavis's horses. The plaintiff would typically ride up to 15 horses each morning. He explained that because the Arlington racetrack opened at 5:30 a.m. and closed at 10:30 a.m., he had about a five-hour span to exercise all 15 horses. After finishing his shift at the Arlington racetrack, the plaintiff would head over to Barrington, where from about 11 a.m. to 3 p.m., he would train five or six of Koertegen's horses.

The plaintiff acknowledged that the Arlington racetrack park contained two tracks, but stated that although he had used both, on June 14, 2004, he mostly used the smaller training track. He also stated that although he was aware there were two exits to this smaller training track, he generally used the east exit. With the help of several photographs, the plaintiff described the east exit as being closed in by the stables on one side and by a fence post, dividing the training track from the path, on the other. According to the plaintiff, the stables were large buildings that could accommodate approximately 30 to 70 horses. There was a bathing area right in front of the stables and next to the entry path, where horses were regularly bathed by the trainers. The horses were placed on rubber pads so that their hoofs would have traction, and they were soaped and bathed right in front of the stables, permitting water to run onto and across the path, toward the training track, and creating a large puddle of standing water in the middle of the path.

The plaintiff stated that he had observed the puddle of standing soapy water at the east exit on the morning of June 14, 2004, as well as every time that he exercised horses at the Arlington racetrack. He averred that it was impossible to get around the water and that he had complained about it on several occasions to the superintendent of the track and to the grounds crew, because he thought it was dangerous. In fact, the plaintiff averred that he had witnessed "near-slip-and-falls" about a couple of times a week because of the standing water and that he urged the superintendent to drain the water or put some "blacktop" over it, because "it was only a matter of time before somebody got hurt."

The plaintiff next discussed the events leading up to his injury. According to the plaintiff, it was a sunny, dry, Monday morning, and he had arrived at the Arlington racetrack at about 5:30 a.m. For the next couple of hours, he proceeded to exercise 11 or 12 horses by riding them on the training track. At about 8:45 a.m. he proceed to exercise Besheft, a six-year-old Thoroughbred. The plaintiff was familiar with this horse as he had exercised him about 30 or 50 times in the past, specifically riding him two days prior to the accident. The purpose of that morning's exercise was to "keep [Besheft] limber," so the plaintiff took the horse out onto the training track and "jogged him" for about 15 minutes. The plaintiff could not recall if there were other riders and horses on the training track at that point, but remembered that the outrider, Tony Haynes was there on his horse.

The plaintiff next testified at about 9:10 a.m., he finished exercising Besheft and was returning from the track to the barn when Besheft "slipped and fell" on a puddle of water located right in the middle of east exit between the barns and the training track. The horse fell over the

plaintiff, crushing his leg.  When questioned about the details of the slip and  fall, the plaintiff testified in the following manner:

"Q. After you were walking off what, if anything happened?

A. Nothing remarkable happened, nothing at all.  For whatever reason, he took a sidestep, and he slipped and he fell.

Q. When you say he took a sidestep you're controlling where he's proceeding; is that correct?

A. Yes.

Q. When you said he took a sidestep, did he go left or right?  Explain sidestep.

A. He took a step to the right, not a big step, maybe seen a reflection in the water or seen his shadow, something.  He decided to just step around it like you normally would do like anybody steps around something, but he slipped."

Later in his deposition, the plaintiff further testified as follows:

"Q. You stated that the horse slipped.  After Besheft slipped, what happened?

A. He slipped, he fell on me.

Q. When he slipped, you were still on the horse?

A. Yes.

Q. How did Besheft fall?

A. He slipped right on top of me.  His legs went out and he slipped like that and fell right on top of me.

* * *

Q. When he takes this step, his whole body goes?

A. Yeah. I'm sure he didn't think he was going to slip and fall. It was on of those things where it was like that. It was instantaneous. It happened in a split second."

The plaintiff stated that once the horse fell on him, it immediately got back up on its feet, leaving the injured plaintiff on the ground. According to the plaintiff, the horse started running and continued to "slip and slide all over the place." The plaintiff explained that at this point, the horse was certainly "spooked" and "scared."

When questioned whether he believed something had "spooked" the horse prior to his fall, the plaintiff adamantly denied that there was anything that could have "spooked the horse," and explained that this was "an old horse" that had walked on this path many times before. When asked what types of things could "spook" a horse, the plaintiff indicated that it could be anything but that it all "depended on the circumstances," so that sometimes a mere "candy wrapper" could do it, while on other occasions a horse would not notice "a semi-truck going by." The plaintiff explained that in the past he has been on horses that were "spooked" and that, generally, "you just remain with the horse and go wherever the horse goes." He stated, however, that in the past he had never seen Besheft spooked and reiterated that this was "an old, quiet horse."

The plaintiff stated that immediately after the fall, he felt his leg swell up to the size of a football and that he knew something was "very wrong." He explained that he had broken a leg in the past but that the pain and the severity of that injury could not be compared to what he endured this time. The plaintiff waited until the ambulance arrived and was taken to a hospital.

9

He explained that, since the accident, he has not worked with horses both because of medical restrictions and because "he is scared to death of riding them," since his doctor has informed him that if he falls again there is a great risk of him becoming paralyzed.

When questioned about other horse-related injuries he had sustained in the past, the plaintiff explained that had sustained only three prior injuries. The first was a broken right leg in March 2000, which he sustained at the starting gate of a horse race at Sportsman's Park. The horse became agitated minutes before the start of the race and jumped back up, pushing the plaintiff's leg against the edge of the gate. The plaintiff attempted to jump off, but his leg got caught between the gate and the horse, and he sustained a broken fibula and tibia. The second injury consisted of a cut, requiring a couple of stitches on the plaintiff's chin, which the plaintiff sustained when he attempted to jump on a horse, which threw his head back and hit him in the chin. The third injury was a cut over the plaintiff's left eye, requiring a couple of stitches. The plaintiff sustained this injury as he was grooming a horse in a stable preparing to take him out for a ride. The horse suddenly became agitated and started running and jumping, and as he did so, the steel part of his bridle swung from his body and hit the plaintiff's eye.

The plaintiff finally averred that riders do not often fall off their horses, but that "it does happen." He stated, however, that he was a very good rider and that on average he has fallen off a horse once a year in the past 10 years.

### B. Janice Ely

On April 6, 2009, Janice Ely, a self-employed horse trainer and owner of Janice Ely Racing Stable, who witnessed the accident, was deposed. Ely stated that she was standing next

to the barn when she observed the plaintiff and his horse fall. She explained that the horse's feet "just slid from under him" and that "it was weird because nothing [really] happened" to cause him to fall. Ely stated that the horse was not walking when it fell but was, in fact, standing when "his feet just came from under him." Ely explained that the horse was standing because plaintiff had stopped to say hello to Ely. Ely conjectured that the horse must have slipped on the water draining from the barn, noting that the water was very slippery as it contained shampoo that the trainers used to bathe the horses. Ely further noted that the path leading from the training track to the barns switched from dirt to asphalt where the water accumulated, making it more slippery for the horses' hooves.

Ely stated that her riders take horses through the water about three to six times a day and that she personally witnessed two of her horses slip in the same area. The first time the horse came running off the track and would not slow down and slipped because he came from dirt directly onto the asphalt. The second time, the horse, which was very agitated, ran through the exit very fast, and slipped and fell peeling his shoulder against the fence. Ely also testified that she had seen horses owned by other trainers slip in the same area.

Although Ely stated that for these reasons she considered the area fairly dangerous, she admitted that she never personally complained about the standing water, but she indicated that the issue was raised at the Horseman's Association meetings, where trainers and owners routinely discussed the maintenance of the racetrack, including the possibility of extending the east exit. Ely, however, acknowledged that it was standard practice in the industry to wash horses immediately after their training, to prevent their muscles from cramping.

11

Although Ely acknowledged the existence of an alternative exit, the west exit, onto the training track, she indicated that she never observed anyone taking that path and that she never took it herself as it was "the longer, round-about way."

C.  Tim Koertegen

The deposition of one of the plaintiff's employers, Tim Koertegen, was taken on February 5, 2009.  Therein, Koertegen stated that he has been a horse trainer since 1975 and that he has known the plaintiff since 1995, when the plaintiff first worked for him as a "gallop boy." Koertegen stated that the plaintiff had "been galloping since he was 16 years old" and that he was well known in the horse world as a "high caliber rider."

Koertegen acknowledged that it was fairly common for inexperienced riders to fall off a horse while "galloping them."  He explained that prior to establishing himself as a trainer, he used to ride horses as well, and he admitted that he has fallen off horses many times.  Koertegen explained that horses are temperamental, "high-strung athletes" that are easily "spooked" by noises, such as the banging of buckets, the clobbering of hooves on concrete, or any similar noisy activities around them that are foreign.  Although Koertegen acknowledged that when a horse gets "spooked" it may kick the rider off, he explained that older horses are generally less temperamental than younger ones, because the older ones are used to their rider and have already acclimated to their environment.

Koertegen testified that horses most often slip and stumble on wet concrete or wet asphalt because those surfaces are very slippery and provide no traction for the hooves. Koertegen stated that apart from the defendant's facilities, he has never seen a racetrack with the

training track dirt surface so close to an asphalt exit. In fact, he stated that most facilities he has used have a horse path to the track made of sand, clay, or a gravel mix, providing the horses' hooves better traction.

Koertegen testified that when he first started using the Arlington racetrack in 1972, there was no asphalt on the east exit leading to the training track. He stated that the asphalt was added in 1974. Although Koertegen never complained to anyone about the asphalt, he stated that he never used the east exit because "it was unsafe." According to Koertegen, there was always water running down to the asphalt exit from faucets on the barns, where the horses were bathed. This water mixed with the dirt and sand from the training track on the asphalt, making the path very slippery. As Koertegen explained:

> "Racehorses have aluminum plates with toe grabs that are a couple inches long. And they're like skates, you know. And when you're walking on sand or dirt, anything that can give a little bit, when they grab, it's firm. But when you grab it on concrete or asphalt there is nothing firm; and then they start slipping ***."

In addition, Koertegen stated that the area was "unsafe" because there were too many horses using the exit, with a lot of "clip-clopping" of hooves on the pavement and banging from the barns. Koertegen explained that the area was the busiest at about 9 a.m. to 10:30 a.m., because the track closes at 10:30 a.m., and all of the trainers are anxious to get their horses onto the track, which is why most of them use the east exit. Koertegen estimated that there are a couple of hundred horses crossing the east exit at this point. He testified that this was not always the case. In the 1980s, there were far fewer stables in the area, and the defendant had longer

13

hours of operation as well as fewer breaks, so that most horses ended up going to exercise on the larger main track. However, according to Koertegen, after the defendant instituted the five-hour morning run, and two breaks, during which horses were pulled off the tracks for tractors to harrow the track, the trainers were forced to exercise their horses at the smaller training track and to use the east exit to do so in the allotted amount of time.

Koertegen stated that many riders preferred not to go to the training track, but that generally a rider had no choice of either the track or the exit but, rather, had to follow his trainer's instructions. He explained that if a rider does not do as he is told, the trainer will go out and find another rider. Although Koertegen stated that it was "typical for riders of Mike Reavis, like the plaintiff, to use the east exit to get in and out of the Reavis stables," which were located very close to east exit of the training track, he acknowledged that he never spoke to Reavis and had no personal knowledge as to whether Reavis had instructed the plaintiff to take Besheft onto the training track or use the east exit.

Koertegen finally stated that although in general he thought the defendant ran a "first-class operation" of the racetrack, it could have "paid more attention" to the water draining onto the path where the plaintiff was injured.

### D. Dr. Eugene Lopez

The plaintiff's treating physician, Dr. Eugene Lopez, was deposed on November 18, 2007. He testified that prior to the incident in this case, he had treated the plaintiff for a similar injury in March 2000. At that time the plaintiff had broken his right leg (specifically, the right tibia) after he fell off a horse. Dr. Lopez treated the plaintiff's fracture of the right tibia by

14

placing a metal rod inside his leg. After this incident, Dr. Lopez advised the plaintiff not to ride horses anymore because it was a "dangerous profession." Dr. Lopez again treated the plaintiff on June 28, 2004, following the instant incident. Dr. Lopez explained that as a result of the fall and the pressure of the horse falling on his left leg, the plaintiff had suffered a left femoral shaft fracture, which necessitated surgery for the reduction of that fracture with a metal rod and titanium nail. Dr. Lopez indicated that the plaintiff would need extensive physical therapy to recover from his injury and that it was his recommendation that the plaintiff not ride horses anymore, as he now "has metal rods in both of his legs," so that any future fall could present very serious injuries.

### E. Anthony Petrillo

The defendant's vice president of facilities and operations, Anthony Petrillo, was deposed on October 9, 2008. Petrillo acknowledged that at the east exit, the horses coming off the dirt training track will encounter an asphalt pathway and standing water in that pathway. Petrillo, however, pointed out the existence of the west exit and explained that at that exit, the horse would also come from dirt, to limestone, and then asphalt, but that it would take the horse much longer to get to the asphalt. Petrillo stated that he disagrees with the proposition that the water draining along the east exit path makes the asphalt slippery for horses. He explained that he disagrees with this proposition because he has never received complaints about the standing water on the asphalt and he would expect a slew of such complaints by trainers, who are in the business of racing very expensive horses and who would certainly want to protect their investment and prevent any injury to their horses.

## F. Javier Barajas

The defendant's superintendent of track and turf, Javier Barajas, was deposed on December 18, 2007, and stated that he has worked for the defendant for almost 30 years. Barajas admitted that part of his responsibility as a superintendent of track and turf was to maintain the ground where the plaintiff was injured and ensure that it was safe for horses and pedestrians alike. Barajas acknowledged that Reavis's riders would use the east exit since it was closest to the Reavis stables and the "most efficient way to get to the training track." Barajas also admitted that prior to the accident on June 14, 2004, every day, he had observed standing water on the asphalt path next to the east exit, but he stated that no one ever complained to him about the standing water, and that he never saw a horse slip or fall in that area.

Following discovery, the defendant filed a motion for summary judgment. Defendant argued that summary judgment was proper because (1) the plaintiff had assumed the risks associated with working with Thoroughbred horses, including any injury that may have resulted from the horse's slip and fall and (2) the plaintiff was aware of the open and obvious nature of the danger that resulted in his injury, namely, the water and soap near the exit of the Arlington racetrack. In support of his motion for summary judgment, the defendant attached the relevant portions of the discovery depositions of the plaintiff, Javier Barajas, Janice Ely, Anthony Petrillo, Dr. Eugene Lopez, and Tim Koertegen; as well as photographs of the area where the fall had occurred.

The plaintiff responded by conceding that the slippery and wet asphalt exit was an open and obvious danger but argued that the deliberate exception to the open and obvious rule should

apply to impose a duty of care upon the defendant. The plaintiff specifically argued that in light of the fact that the plaintiff had only 5 hours to exercise about 15 horses, each for about 15 to 17 minutes, and that the east exit provided an immediate access to the training track, as opposed to the round-about west exit, if one construes the evidence in the pleadings and depositions in the light most favorable to him, there remains an issue of fact as to whether the defendant could have anticipated that a reasonable person in plaintiff's shoes would proceed to encounter the wet and slippery east exit despite the risk. In support of his argument, the plaintiff attached relevant portions of his own deposition, as well as the depositions of Javier Barajas, Janice Ely and Tim Koertegen.

Oral arguments on the defendant's motion for summary judgment were heard on August 20, 2009. During oral argument, the circuit court noted that in its response to the motion, the plaintiff's counsel had not addressed the defendant's argument that the plaintiff had assumed the inherent risk of riding a horse, nor had he addressed any of the cases cited to by the defendant on this issue. The plaintiff's attorney indicated that he did not address this issue as he believed those cases were inapposite. Counsel was then given an opportunity to orally address this issue as well as distinguish the cases cited to by the defendant.

After arguments on the remaining issues were heard, the circuit court granted defendant's motion for summary judgment, finding as a matter of law that: (1) the plaintiff had assumed the inherent risk of riding a horse, and (2) that the deliberate exception to the open and obvious rule did not apply to permit the plaintiff to proceed with his case. In concluding that the deliberate encounter exception did not apply, the trial court specifically stated: "[T]his court does not

accept plaintiff's argument regarding the deliberate encounter exception. The evidence shows that the plaintiff had other options and did not need to or he was not forced in any way to walk the horse through the east gate."

On November 4, 2009, the plaintiff filed a motion for reconsideration, which, after hearing arguments, the circuit court denied.[3] The plaintiff now appeals contending that summary

---

[3]It appears that during the motion for reconsideration, counsel for the plaintiff attached to her motion, for the first time, a copy of the previously taken deposition of expert witness John Patrick Veague. In that deposition, among other things, Veague stated that the asphalt surface at the east training track exit, as well as the soapy water on that surface, presented an unreasonable risk of harm to the horses and individuals on the horses. As Veague explained: "[I]t would be like [a person] going out right now and running 26 miles, what its going to feel like to a horse. And then to turn around and walk on a muddy and wet surface would be like me asking you, after you're done running the 26 miles, to put on ice-skates and walk from here to Lake Michigan without falling." Veague further concluded that the defendant must have been aware that the soapy water on the asphalt surface would be a slipping hazard for horses exiting the training track and that horses should not have been washed near the exit where the water would accumulate. He also stated that a transition surface was needed at the exit to ensure the safety of the horses and the riders. Veague finally concluded that it was the ground conditions that caused the plaintiff's horse to slip and fall rather than any risks associated with riding a horse.

Veague's deposition was not attached to the plaintiff's original response to the defendant's motion for summary judgment. When asked to explain why she did not provide the

No. 1-09-3460

judgment was improper.

## II.  ANALYSIS

We begin by noting the well-established principles regarding grants of summary judgment.  Summary judgment is "a drastic measure [of disposing litigation] and should only be granted if the movant's right to judgment is clear and free from doubt."  Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102 (1993).  Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2004); see also Fidelity National Title Insurance Co. of New York v. West Haven Properties Partnership, 386 Ill. App. 3d 201, 212 (2007), citing Home Insurance Co. v. Cincinnati Insurance Co., 213 Ill. 2d 307, 315 (2004).

---

court with this deposition earlier, the plaintiff's counsel indicated that she and her partner had formed a separate practice by leaving the original firm representing the plaintiff, but that when they took the plaintiff with them as their client, the original firm failed to provide them with Veague's deposition on time for them to attach it to the response to the defendant's motion for summary judgment, which was due a week after the deposition was taken on July 17, 2009.  The trial court nevertheless indicated that it could not and would not consider this deposition in evidence.  Neither party on appeal contends that the trial court erred by refusing to consider this deposition, or that this deposition is relevant to the determination of the issues in this appeal, since both parties agree that the soapy and wet asphalt near the east exit presented an open and obvious danger.

19

In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings and evidentiary material in the record strictly against the moving party. Happel v. Wal-Mart Stores, Inc., 199 Ill. 2d 179, 186 (2002). Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law. Caponi v. Larry's 66, 236 Ill. App. 3d 660, 670 (1992). A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. In re Estate of Ciesiolkiewicz, 243 Ill. App. 3d 506, 510 (1993); see also Espinoza v. Elgin, Joliet & Eastern Ry. Co., 165 Ill. 2d 107, 114 (1995) ("[W]here reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to the material fact, summary judgment should be denied and the issue decided by the trier of fact."). We review the circuit court's decision to grant or deny a motion for summary judgment *de novo*. Home Insurance Co., 213 Ill. 2d at 315.

To state a cause of action for negligence, a plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty, and that this breach proximately caused the plaintiff to be injured. Bajwa v. Metropolitan Life Insurance Co., 208 Ill. 2d 414, 421 (2004).

The question of whether defendant owed plaintiff a duty of care is a question of law to be determined by the court. Bajwa, 208 Ill. 2d at 422. The "touchstone of [a reviewing] court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the

20

benefit of the plaintiff." Marshall v. Burger King Corp., 222 Ill. 2d 422, 436 (2006). In determining whether a duty exists, we look to four factors: (1) foreseeability; (2) likelihood of injury; (3) magnitude of the burden on the defendant to guard against the injury; and (4) consequences of placing a burden on the defendant. LaFever v. Kemlite Co., 185 Ill. 2d 380, 389 (1998).

Where, as here, an injury is allegedly caused by a condition on a defendant's property, our courts agree that the first factor to be considered is foreseeability. See, *e.g*., LaFever, 185 Ill. 2d at 389; see also Preze v. Borden Chemical, Inc., 336 Ill. App. 3d 52, 57 (2002). In doing so, we are guided by the analysis of section 343 of the Restatement (Second) of Torts and our supreme court's interpretation of it. LaFever, 185 Ill. 2d at 389; see also Sollami v. Eaton, 201 Ill. 2d 1, 16-17 (2002). Section 343 subjects a landowner to liability if the owner: (1) knows or by the exercise of reasonable care would discover the condition; (2) should expect that the danger will not be discovered by the invitees; and (3) fails to exercise reasonable care to protect them against the danger. Restatement (Second) of Torts §343 (1965). This duty, however, does not extend to risks created by " 'open and obvious' " conditions. Preze, 336 Ill. App. 3d at 57, quoting, Bucheleres v. Chicago Park District, 171 Ill. 2d 435, 448 (1996); see also Restatement (Second) of Torts §343 (1965).

### A. Deliberate Encounter Exception

In the present case, the plaintiff concedes that the soapy standing water on the asphalt next to the east exit of the training track constituted an open and obvious condition of which he was aware. The plaintiff contends that the defendant is nevertheless liable under the deliberate

encounter exception contained in the comments to section 343A of the Restatement.

Under the "deliberate encounter" exception to the open and obvious rule, a duty is imposed when a possessor of land "has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." Restatement (Second) of Torts §343A, Comment *f*, at 220 (1965). Liability under this exception stems from the landowner's knowledge of the premises and what the landowner had reason to expect the invitee would do in the face of the dangerous condition. LaFever, 185 Ill. 2d at 392; Preze, 336 Ill. App. 3d at 58. Although this exception has most often been applied in cases involving some economic compulsion, as where workers are compelled to encounter dangerous conditions as part of their employment obligations (see, *e.g.*, LaFever, 185 Ill. 2d at 392; Ralls v. Village of Glendale Heights, 233 Ill. App. 3d 147, 155-56 (1992)), our supreme court has made clear that it has not limited the exception only to such situations. See Sollami, 201 Ill. 2d at 16.

The defendant asserts that the deliberate encounter exception does not apply here because the plaintiff failed to present any evidence of economic compulsion. The defendant further asserts that the trial court properly concluded that the deliberate encounter exception does not apply because there were two reasonable alternatives available to the plaintiff by which to avoid the standing water at the east exit, namely, the west exit onto the training track, or the use of the defendant's main racing track. The defendant argues that the deliberate encounter exception applies only to situations where no reasonable alternative is provided to the plaintiff. We disagree.

In LaFever, our supreme court specifically addressed and rejected the same arguments raised here by the defendant. In LaFever, the plaintiff was injured when he was picking up a compactor container on the defendant's premises, and as a result of this activity, he slipped on some plastic edge trim, which would collect in the area around the compactor. LaFever, 185 Ill. 2d at 385-86. There was no direct testimony that the plaintiff would lose his job if he failed to pick up the container. Even without this testimony, however, the court found that the defendant could have reasonably foreseen that the plaintiff would risk walking through the edge trim because it was necessary for the plaintiff to fulfill his employment obligations. LaFever, 185 Ill. 2d at 392.

In coming to this conclusion, the supreme court specifically rejected defendant's contention that a deliberate encounter could not give rise to liability unless "there is no reasonable alternative available to the worker other than encountering the dangerous condition and the worker's continued employment is at stake if he doesn't encounter the condition." LaFever, 185 Ill. 2d at 393. In doing so, our supreme court first noted that the specific language of section 343A of the Restatement frames the duty analysis with an eye to the foresight of the landowner, and not the invitee. See LaFever, 185 Ill. 2d at 390, quoting Restatement (Second) of Torts §343A(1) (1965) ("A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them *unless the possessor should anticipate the harm despite such knowledge or obviousness*" (emphasis in original)). Our supreme court then noted that a standard focusing on the existence of reasonable alternatives to the open and obvious danger, would infringe on the specific

23

language of the Restatement and focus on the plaintiff's reasonableness, rather than that of the landowner. LaFever, 185 Ill. 2d at 393. As the court noted: "[Such a] test *** would require a court to decide foreseeability by measuring the reasonableness of the entrant's actions, and not those of the landowner, even though the Restatement plainly requires otherwise." (Emphasis is omitted.) LaFever, 185 Ill. 2d at 393. Accordingly, the court concluded that the existence of a duty is not determined by the presence or lack of alternative avenues by which to avoid an open and obvious danger but, rather, by whether the landowner could foresee whether despite the open and obvious nature of the condition, the plaintiff (with or without alternative means) would nevertheless have chosen to encounter that condition. LaFever, 185 Ill. 2d at 391-92; see also Bier v. Leanna Lakeside Property Ass'n, 305 Ill. App. 3d 45, 56 (1999), quoting LaFever, 185 Ill. 2d at 393 (explaining the scope of our supreme court's holding in LaFever in the following manner: "In finding that the defendant owed a duty to the drivers of the disposal company, the supreme court rejected the defendant's argument that a 'deliberate encounter' cannot give rise to liability unless there is no reasonable alternative available to the worker and the worker's continued employment is at stake if he refuses to encounter the condition. [Citation.] The court [in LaFever] noted that the focus of the Restatement test is not the reasonableness of the entrant's actions. [Citation.]").

Similarly, in Ralls, the plaintiff was injured when he slipped and fell on a snow covered incline at a construction site. Ralls, 233 Ill. App. 3d at 150. The trial court held that the condition was open and obvious and granted summary judgment in favor of the defendant, the construction site owner. Ralls, 233 Ill. App. 3d at 151. The appellate court reversed the trial

court's finding, noting that the trial court had erroneously failed to apply the deliberate encounter exception. Ralls, 233 Ill. App. 3d at 152. The appellate court found that it was reasonably foreseeable that a worker at the site would use the snow-covered incline to reach the south door of the blower building rather than use "the longer and inconvenient perimeter path." Ralls, 233 Ill. App. 3d at 155. In doing so, the court noted that it was uncontroverted that workmen "did just that during the six months after the incline was created" by the passage of the workers on the snow-packed footpath. Ralls, 233 Ill. App. 3d at 155. Accordingly, the court concluded that it was reasonably foreseeable that the workers would use the "*shortest path* to the southern door of the blower building." (Emphasis added.) Ralls, 233 Ill. App. 3d at 156. [4]

Applying the rationale of our supreme court in LaFever and the aforementioned cases to the facts at bar, we find that the evidence in the record, in the very least, raises an issue of material fact as to whether defendant could have anticipated that the plaintiff would deliberately

---

[4]We note that the defendant is correct in asserting that in coming to its decision the court in Ralls also noted that at the time of the accident the use of the southern doorway was necessitated by the blockage of the only other access to the building. Ralls, 233 Ill. App. 3d at 154. However, contrary to the defendants' assertion, the court in Ralls did not premise the foreseeability analysis on this factor alone. Ralls, 233 Ill. App. 3d at 155. Rather, as noted above, the court relied on the fact that with two alternative routes available, and the workers using the shorter path on a daily basis for six months, the landowner could have reasonably anticipated that the plaintiff too would use this shorter path despite the obvious and dangerous condition on it. Ralls, 233 Ill. App. 3d at 155.

encounter this open and obvious condition in order to do his job as an exercise rider for Reavis. It is undisputed that the east exit was closer to the training track than the west exit. The plaintiff and Koretegen both testified that the east exit was closer to the Reavis stables. The plaintiff also testified that time was of the essence each morning because of the number of horses that he needed to exercise on the training track. Specifically, the plaintiff explained that he had to exercise between 15 to 20 horses for Reavis within a span of five hours, exercising each horse for about 15 minutes. He stated that although he had used the main racing track, most of the time, including the morning of the injury, he exercised Reavis's horses on the smaller training track. In addition, Ely, a trainer at the track at the time of the incident specifically stated in her deposition that she never observed anyone taking the west exit to the training track and that she never took it herself, because it was "the longer, round-about way." On the other hand, another trainer, Koretegen, stated that in all his time at the training track, he never used the east exit because he thought it was "dangerous." Under these facts, we find there was sufficient evidence presented by the plaintiff to preclude summary judgment on the issue of whether the defendant could have anticipated that the plaintiff would use the east exit despite the dangerous condition there.

The defendant nevertheless asserts that the plaintiff failed to show that he in fact would have lost his job had he failed to take the east exit. The defendant specifically notes that the plaintiff nowhere alleged that Reavis ordered him to take the east exit, or that there would have been consequences had he not done so. The defendant also notes that the plaintiff failed to provide an affidavit or deposition of Reavis on this subject. The defendant contends that

Koretegen's deposition testimony that generally riders must follow orders from trainers, unless they wish to be fired, and that Reavis riders generally used the east entrance because of its proximity to the stables and the number of horses that had to be trained was insufficient because Koretegen had no personal knowledge of Reavis's directives to the plaintiff. We disagree.

The defendant again seems to misconstrue the holding in LaFever. As already explained above, in rejecting a similar argument raised by the defendant in that case, our supreme court noted that whether an employee will, in fact, lose his job if he refuses to proceed in the face of danger cannot be known, "absent an individual interview by the premises owner with every business invitee that comes on to the premises." LaFever, 185 Ill. 2d at 394. Our supreme court first noted that there was nothing in the Restatement imposing such a burden on landowners. LaFever, 185 Ill. 2d at 394. The court then proceeded to find, solely on the basis of defendant's knowledge that drivers would encounter the hazardous condition, that the defendant could have reasonably foreseen that the drivers would deliberately encounter the hazard in order to fulfill their obligations and, consequently, keep their jobs. LaFever, 185 Ill. 2d at 394; see also Bier, 305 Ill. App. 3d at 56, quoting LaFever, 185 Ill. 2d at 395 (explaining that in imposing a duty on the landowner under the deliberate encounter exception in LaFever our supreme court made clear that "it was not critical that the employee would actually lose his job if he refused to encounter the danger. [Citation.] Rather, the court concluded that the defendant 'could reasonably foresee an "economic compulsion" imposed on the *** drivers to perform the work they were hired to do. [The defendant] therefore had reason to know that these same drivers would deliberately encounter the hazard in order to fulfill their obligations and, consequently,

27

keep their jobs" [Citation.]).

In the present case, for the reasons already fully articulated above, it is impossible to conclude, as a matter of law, that the defendant, which was clearly aware that on a daily basis riders used the east exit because of its proximity to the training track, so as to exercise all of their horses within a span of only five hours, could not have anticipated that the plaintiff would elect the choose east exit, despite the dangerous condition there. See LaFever, 185 Ill. 2d at 392 (holding that defendant could have reasonably foreseen that plaintiff would deliberately walk on slippery edge trim in course of performing his regular job duties, where defendant was aware that workers stepped on such edge trim on a regular basis in order to fulfill their job duties); see also Ralls, 233 Ill. App. 3d at 155-56 (holding that it was reasonably foreseeable that construction workers would use the "shortest path" to door of building on the work site, even though the path was snow-covered and slippery).

Moreover, even if the aforementioned facts in the record were for some reason insufficient to establish "economic compulsion," as already noted above, subsequent to its decision in LaFever, in Sollami, our supreme court made clear that it would not limit the deliberate encounter exception solely to situations involving "economic compulsion." See Sollami, 201 Ill. 2d at 16 ("The deliberate encounter exception has most often been applied in cases involving some economic compulsion. [Citations.] *** [W]e do not hold [,however,] that the deliberate encounter exception is applicable only in the kind of situations involved in LaFever and Ralls ***").

Accordingly, for the aforementioned reasons, we find the circuit court's decision to grant

summary judgment on the basis of the inapplicability of the deliberate encounter exception was improper.

## B. Assumption of Risk

The defendant nevertheless asserts that regardless of the deliberate encounter exception, as a matter of law, the defendant owed the plaintiff no duty, because, being a professional horse rider, he assumed the inherent risks of injuries sustained while riding a horse. In support of this contention, and without much argument, the defendant cites to several cases for the proposition that professional horse riders will always necessarily assume the risks associated with horse riding, including injuries sustained while falling off a horse. See Gray v. Pflanz, 341 Ill. App. 527, 532 (1950) (noting that because "[p]laintiff *** was a professional jockey," "[h]e assumed the inherent risk of his profession," namely, falling off an allegedly blind horse that plunged through the outside rail of a fence on the racetrack during a race); Clark v. Rogers, 137 Ill. App. 3d 591, 595 (1985) (noting that within the context of a claim brought under the Animal Control Act, the plaintiff, who was a trained horsewoman and accepted employment as a trainer of stallions knowing such horses were likely to "buck or jump," assumed the risk of a fall resulting from the stallion bucking, despite her claim that the stallion acted out because the defendant negligently taunted him earlier that day); see also Vanderelei v. Heideman, 83 Ill. App. 3d 158, 163 (1980) (noting that a professional horseshoer assumes the risk of being kicked while shoeing a horse voluntarily with full knowledge and appreciation of the danger).

Although not fully articulated by the defendant, this argument points to the primary implied assumption of risk doctrine, under which a plaintiff is barred from any recovery where

he "assumes known risks inherent in a particular activity or situation." Sullivan-Coughlin v. Palos Country Club, Inc., 349 Ill. App. 3d 553, 560 (2004); see also Duffy v. Midlothian Country Club, 135 Ill. App. 3d 429, 433 (1985). The risks assumed are not those created by the defendant's negligence but rather those created by the nature of the activity itself. Duffy, 135 Ill. App. 3d at 433.

We first note that the defendant's argument leaves open the question as to the relationship between the deliberate encounter exception and the primary assumption or risk doctrine, *i.e.*, whether the deliberate encounter exception is subject to the assumption of risk doctrine or whether it is inapplicable where primary assumption of risk applies.

Although not argued by the parties, it appears that there is only one Illinois case directly on point, namely Smithers v. Center Point Properties Corp., 318 Ill. App. 3d 430, 441-42 (2000). See Hastings v. Exline, 326 Ill. App. 3d 172, 176 (2001) ("The only Illinois case we have located discussing the assumption-of-risk doctrine as it relates to the deliberate encounter exception is Smithers ***"). In Smithers, a fireman brought a premises liability action against warehouse owners seeking damages for the fireman's slip and fall at the warehouse, which occurred while the fireman was responding to a " 'full flow water alarm.' " Smithers, 318 Ill. App. 3d at 432. The warehouse owners argued that the fireman's rule precluded the plaintiff from any recovery, and the plaintiff retorted that the deliberate encounter exception would permit his recovery despite the fireman's rule. Smithers, 318 Ill. App. 3d at 433-4. The Smithers court agreed with the defendants and held that the deliberate encounter exception does not apply to a fireman under the fireman's rule. Smithers, 318 Ill. App. 3d at 436. Under that rule, a

fireman generally assumes "the risks associated with fighting that fire, but not those risks which are unrelated and independent to the fire." Smithers, 318 Ill. App. 3d at 436. This would restrict the landowner's duty of care to keep his premises safe for firemen to limited situations in which a fireman was injured by causes independent of the fire or situations in which the danger is readily apparent even if it is not independent of the fire. Smithers, 318 Ill. App. 3d at 436.

In rejecting the plaintiff fireman's effort to apply the deliberate encounter exception, the court held that this exception would be contrary to public policy concerning the right of the public to fire protection without the risk of incurring liability in fighting that fire. The court stated:

> " '[The fireman's rule] evolved for two mutually supportive reasons. First, since most fires occur because of the negligence of the landowner or occupier, it was believed that the imposition of a duty to prevent fires from occurring or spreading on a person's premises would place an unreasonable burden upon the person who owned or occupied improved land. [Citations.] This public policy consideration, however, tended to undermine the general duty imposed upon landowners or occupiers to exercise reasonable care to keep their premises safe. A compromise was reached with regard to firemen, recognizing that the risk of harm from fire is inherent in a fireman's occupation.' " Smithers, 318 Ill. App. 3d at 442, quoting Court v. Grzelinski, 72 Ill. 2d 141, 148 (1978).

The fireman's rule has been applied only to "other emergency responders, such as police officers, and emergency medical technicians." Rusch v. Leonard, 399 Ill. App. 3d 1026 (2010).

31

Thus, implicitly the court in <u>Smithers</u> recognized that the deliberate encounter exception would otherwise apply to other professions where these same public policy concerns were inapplicable. See <u>Smithers</u>, 318 Ill. App. 3d at 442 ("The duties and responsibilities of a fireman are very different from those of a refuse truck driver. 'Hazards negligently created are staples of the duties that firemen, and policemen are expected to perform. Although the citizen immunized is not free from fault, the quality of fault is not so severe that the grant of immunity from liability for injuries sustained by firemen and policemen in the ordinary course of their duties offends the common sense of justice.' [Citations.] The supreme court's purpose for carving out the fireman's rule was due to the unique tasks associated with the responsibilities of being a fireman. Inherent in firemen's duties deliberately encountering certain types of dangers which are unique to their fire-fighting responsibilities"); see also <u>Court</u>, 72 Ill. 2d at 148 (the rationale for the rule is based on the fact that firefighters receive specialized training to anticipate and encounter risks associated with fires therefore he would not recover for injuries caused by dangers which his training and experience would lead him to reasonably anticipate).

Accordingly, we do not find sufficient support to conclude that the primary assumption or risks associated with horse riding would necessarily abrogate the deliberate encounter exception in the same manner the fireman's rule would. See <u>Hastings</u>, 326 Ill. App. 3d at 176 (noting the "tension" between the deliberate encounter exception and the assumption or risk doctrine as explained by <u>Smithers</u> and stating that the fireman's rule may well present a "specialized case").

Moreover, arguably even if the assumption of inherent risks associated with

32

horsemanship would apply to bar the application of the deliberate encounter exception, it would not be applicable to those dangers attributable solely to the defendant's negligence. See Duffy, 135 Ill. App. 3d at 433 (noting that the risks assumed under the primary assumption of risk doctrine "are not those created by [the] defendant's negligence but rather those created by the nature of the activity itself"); see also Herendeen v. Hamilton, 317 Ill. App. 644, 648 (1943) (holding that the doctrine of assumption of risk did not apply to bar the plaintiff from recovering damages in a negligence action by a racecourse owner, where the horse was injured at the start of the race because a safety pad was not attached to the horse; noting that "the plaintiff did not have control of the property nor of the danger to which his horse was exposed. Both of these instrumentalities were entirely under the control of defendant and it was his negligence *** which resulted in the injuries sustained"); see also Gray, 341 Ill. App. at 532 (noting that although the plaintiff who was a "professional jockey," "assumed the inherent risks of his profession," when he fell off an allegedly blind horse that plunged through the outside rail of a fence on the racetrack during a race, the assumption of risk doctrine could have been averted if the plaintiff had presented evidence that the defendant was aware of the horse's blindness and his failure proximately contributed to the injuries sustained by the plaintiff).

Accordingly, for the aforementioned reasons, we disagree with the circuit court's basis for granting summary judgment in favor of the defendant, since there is no reason to conclude that the risks associated with a puddle of water could proscribe the application of the deliberate encounter exception, where there was at least an issue of fact as to whether the risk was created by the defendant's negligent maintenance of the premises.

We, therefore, reverse the judgement of the circuit court and remand for further proceedings.

Reversed and remanded.

CAHILL, P.J., and ROBERT GORDON, J., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

Please use the following form

QUENTIN MORRISSEY,

        Plaintiff-Appellant,

v.

ARLINGTON PARK RACECOURSE, LLC,

        Defendant-Appellee.

Docket No.

COURT

Opinion
Filed

No. <u>1-09-3640</u>

Appellate Court of Illinois
First District, <u>FIFTH</u> Division

   <u>September 10, 2010</u>
(Give month, day and year)

JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:

JUSTICES

~~PRESIDING JUSTICE CAHILL and JUSTICE ROBERT GORDON~~ concur.

Lower Court and Trial Judge(s) in form indicated in margin:

APPEAL from the
Circuit Court of Cook
County; the Hon___
Judge Presiding.

Appeal from the Circuit Court of Cook County;

The Hon. <u>Eileen Mary Brewer</u> Judge presiding.

APPELLANTS
John Doe, of Chicago

For APPELLEES,  :

Smith and Smith of
Chicago.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel.  Indicate the word FOR NONE if not represented.

FOR APPELLANT: Mark C. Murnane, O'Connor & Nakos, Ltd., 120 North LaSalle Street, 35th Floor, Chicago IL 60602; 312-546-8100

APPELLEE: P. Shawn Wood, Brian P. Roche, Josh Jubelirer, Seyfarth Sahw LLP, 131 South Dearborn Street, Suite 2400, Chicago IL 60603; 312-460-5000; swood@seyfarth.com

Add attorneys for third-party appellants and/or appellees.