# Illinois Official Reports

## Appellate Court

*800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882

| | |
|---|---|
| Appellate Court Caption | 800 SOUTH WELLS COMMERCIAL LLC, Plaintiff-Appellant, v. JOHN CADDEN, Defendant-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-16-2882 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | March 21, 2018<br><br>April 24, 2018<br>May 9, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-2895; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | F. Dean Armstrong, of Armstrong Law Firm, P.C., of Frankfort, for appellant.<br><br>David M. Jenkins, of The Jenkins Law Group, P.C., of Chicago, for appellee. |

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Lavin concurred in the judgment and opinion.


**OPINION**

¶ 1    Upon the filing of the parties' cross-motions for summary judgment, the trial court granted defendant-appellee John Cadden's motion for summary judgment and denied plaintiff-appellant 800 South Wells Commercial LLC's motion for summary judgment. Plaintiff appeals, contending that the trial court erred in granting summary judgment for defendant where the evidence raised a question of fact as to whether defendant owed fiduciary duties to plaintiff and a question of fact as to whether he breached these duties. Plaintiff asks that we reverse the trial court's order and remand the cause for trial on the merits. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3    This cause has already been before our court, in some related form, several times. Its history, which now spans over a decade, is lengthy and, in many respects, complex. For purposes of the instant matter, we present only those facts that are most relevant to our determination herein.

¶ 4    In 1997, River City Complex (Complex) was an area that consisted of an apartment complex, a commercial space, a surface parking lot, a parking garage, and a marina. A development corporation owned by Nicholas Gouletas, known as American Invesco Development Corporation (Invesco),[1] purchased the Complex in April 1997.

¶ 5    Plaintiff, a manager-managed Illinois limited liability company, was formed in early 2001. Its members consisted of Gouletas and a Michigan company known as River City Investors, LLC (RCI). Pursuant to its operating agreement (Operating Agreement), plaintiff was formed specifically in order to obtain a leasehold interest in the Complex's commercial space and parking garage now held by Invesco. The Operating Agreement stated:

> "The purpose of the Company is to acquire the Property and to lease, improve, sell the Property, and to engage in any and all activities related or incidental thereto."

The Operating Agreement defined "the Property" as

> "a leasehold interest in that portion of the property located at 800 South Wells Street, Chicago, Illinois, generally consisting of approximately 240,000 square feet of net rentable commercial space and approximately 130 indoor parking spaces in the building located on the Property."

The Operating Agreement named Gouletas as plaintiff's managing member with the "the sole and exclusive right to manage plaintiff" and permitted him, as manager, to appoint officers to

---

[1] Throughout the record, this corporation is referred to in several different ways, including American Invesco Development Corporation, American Invesco Development Corporation, and Invsco Management Company, Inc. For purposes of this appeal, we will refer to it as Invesco.

assist in plaintiff's operations. Section 5.9 of the Operating Agreement, entitled "Officers," stated:

> "The Managing Member shall elect officers ("Officers") to carry out the policies and objectives of the Managing Member. Subject to the policies and objectives prescribed by the Managing Member, the Officers shall establish operating procedures for, and administer and direct, the day to day operations of the Company. The powers of the Officers may be broadened or limited from time to time in the discretion of the Managing Member and each Officer shall, at a minimum, be empowered to carry out (and shall carry out) any activity expressly authorized in a written resolution of the Managing Member. *** Each Officer shall serve until removed by the Managing Member. The Managing Member may remove any Officer at any time for any reason. *** No Officer shall receive any compensation for such Officer's services to the Company."

Further, the Operating Agreement dictated that plaintiff, as a company

> "shall engage in no other business until such time as [any mortgages] *** have been repaid in full, at which time the purpose of the Company shall be expanded to include the acquisition(s) of additional properties, and to lease, sell, or improve the additional properties, and any and all activities related or incidental thereto."

¶ 6    On March 1, 2001, Gouletas, as plaintiff's manager and member, and RCI, as its only other member, unanimously issued a certificate of managing member authority (Certificate) on behalf of plaintiff. In it, Gouletas appointed defendant to be plaintiff's vice president "in accordance with the provisions of Section 5.9 of the Operating Agreement." This Certificate also authorized plaintiff to acquire the leasehold interest in the commercial space and the parking garage, as had been described in its Operating Agreement, pursuant to a leasehold purchase and sale by assignment agreement. Originally, the lease included rights to the marina. However, the lease was amended to separate out the marina and remove it from the deal, and the Certificate ordered and directed defendant to approve the amendment to the lease and proceed with the deal on plaintiff's behalf. Accordingly, at the closing, plaintiff received a leasehold interest in only the commercial space and the parking garage, pursuant to the amended lease and as had been described in its Operating Agreement and authorized in the Certificate.

¶ 7    With respect to the commercial space and the parking garage, these were encumbered by a first mortgage plaintiff secured from Parkway Bank and Trust Company and a second mortgage it secured from CIB Bank. Eventually, the second mortgage was purchased by D.A.N. Joint Venture III, L.P. (DJV). By the end of 2005, plaintiff was in default on both mortgages.

¶ 8    WRT-Marc RC, LLC (WRT) became interested in purchasing the commercial space (but not necessarily the parking garage) from plaintiff. It sought to purchase the first mortgage from Parkway Bank and foreclose upon the commercial space and parking garage. At this time, although plaintiff was the lessee of the commercial space and parking garage, another entity owned by Gouletas, 800 South Wells Phase I, LLC, also known as River City Commercial (RCC), was their fee simple owner and lessor. Thus, WRT sought both plaintiff's and RCC's consent to a foreclosure, so that WRT could obtain a fee simple interest in these two assets.

¶ 9    Defendant, while still vice president of plaintiff, had also by this time become vice president of RCC.[2] During negotiations with WRT, an agreement arose that neither plaintiff nor RCC would contest the foreclosure of the commercial space and parking garage provided that WRT grant an option to acquire the parking garage from WRT at WRT's cost. Defendant consulted with plaintiff's counsel about the potential for this option agreement.

¶ 10   Thereafter, WRT prepared a document with respect to the option agreement, known as Px1. In this document, WRT wrote that:

> "[WRT] will grant the borrower (or another group) the option to buy the indoor 133 parking spaces for the amount of our outstanding loan balance above $10,000,000. The borrower will have 30 days after the completion of the foreclosure & pay-off of the new condominium loan in #4 to exercise the option to purchase the 133 in-door parking spaces."

Px1 was never signed nor dated by WRT, nor anyone else, and never specified what entities were involved in the potential option agreement, other than "the borrower (or another group)."

¶ 11   Eventually, WRT and defendant, in his capacity as RCC's vice president, executed a written and signed option agreement whereby RCC was granted the option to acquire the parking garage. RCC then assigned its rights under this option agreement to another entity, River City Parking, LLC (River City Parking). In April 2006, WRT, which had by this time purchased the first mortgage on the commercial space and the parking garage, filed suit to foreclose on that mortgage. Plaintiff did not contest the foreclosure, and a foreclosure judgment was entered in favor of WRT in October 2006. WRT went on to purchase the parking garage and commercial space at a foreclosure sale.

¶ 12   In November 2006, DJV, which held the second mortgage, took control of plaintiff's voting rights. It removed Gouletas as plaintiff's manager, and defendant's role as plaintiff's vice president ended.

¶ 13   Plaintiff filed a complaint against Gouletas, RCC, Invesco, River City Parking, its own attorneys, and defendant, asserting various counts. With respect to defendant,[3] plaintiff alleged he breached fiduciary duties he owed to plaintiff as its vice president. Specifically, plaintiff alleged that defendant diverted a corporate opportunity when he failed to obtain the option to acquire the parking garage for plaintiff (which WRT eventually granted to RCC), improperly transferred an asset when he allowed the transfer of the marina out of the initial deal in which plaintiff obtained the commercial space and parking garage without receiving valuable consideration for it, and improperly allocated expenses.

¶ 14   As litigation progressed, plaintiff's counsel, against whom plaintiff asserted claims of aiding and abetting Gouletas and defendant in allegedly breaching their fiduciary duties with respect to the option to acquire the parking garage, filed a motion to dismiss the counts against them. The trial court granted counsel's motion, and we affirmed counsel's dismissal from the suit on appeal. See *800 South Wells Commercial, LLC v. Horwood Marcus & Berk Chartered*, 2013 IL App (1st) 123660.

---

[2] Defendant was simultaneously vice president for several of Gouletas's business entities, including, for example, Invesco, as well as plaintiff and RCC.

[3] For the record, the operative complaint relevant to the instant cause is plaintiff's fourth amended complaint and its allegations therein against defendant.

- 4 -

¶ 15    Similarly, River City Parking, who had acquired the parking garage via the written option with WRT and against whom plaintiff also asserted claims of aiding and abetting Gouletas and defendant's alleged breach of fiduciary duties, likewise filed a motion to dismiss the count against it. The trial court granted its motion. It held that Px1, which plaintiff insisted was an agreement between it and WRT for the option, was not such an agreement but, rather, only a "document" embodying "a term sheet that indicates further discussion is necessary, not a final offer." Additionally, and specifically highlighting that document's express language that WRT will grant the option to "the borrower (or another group)," the court further held that, even were it a firm agreement (which it was not), the document never granted plaintiff the sole option to purchase. Plaintiff did not appeal this holding of the trial court.[4] See *800 South Wells Commercial, LLC v. Gouletas*, No. 11-L-2895 (Cir. Ct. Cook County, July 11, 2014).

¶ 16    Following all this, defendant filed a motion for summary judgment.[5] He stated that, as a matter of law, he did not owe plaintiff any fiduciary duties and that, even if he did, he had not breached them. In support of his argument, he referenced several portions of plaintiff's Operating Agreement, the Certificate, affidavits, and depositions. Plaintiff filed a cross-motion for summary judgment stating that, as a matter of law, defendant did owe fiduciary duties, that he exercised managerial control over plaintiff, and that he breached these duties.

¶ 17    Among the affidavits and depositions presented to the trial court as summary judgment evidence were those of defendant, Gouletas, Daniel Cadle, and David May. Briefly, Cadle, who controls DJV (plaintiff's manager following the ouster of Gouletas), stated that, with respect to defendant's control over plaintiff, while it was known that Gouletas was plaintiff's managing member, defendant, as vice president, "acted as and ran most of [Gouletas's] companies." Cadle, however, was never a manager or member of plaintiff or any Gouletas company during defendant's tenure as vice president. Cadle also testified with respect to the parking garage option agreement between WRT and plaintiff, admitting that the Px1 document was never signed by anyone and did not specify it was between certain companies. Cadle further admitted that Px1 had not been prepared by defendant, Gouletas, or plaintiff, that it was WRT's internal memorandum, and that the phrase "we will grant the borrower (or another group) the option" to purchase the parking garage from WRT did not necessarily mean plaintiff.

¶ 18    May was legal counsel and the authorized agent for RCI, which, along with Gouletas, comprised plaintiff's original members. May attested that defendant was appointed plaintiff's vice president by Gouletas in his capacity as plaintiff's manager, that defendant's appointment was pursuant to section 5.9 of plaintiff's Operating Agreement, and that he (May) approved this on behalf of member RCI. May stated that defendant "was not granted status as a Manager

---

[4]We further note for the record that, with respect to Gouletas, against whom plaintiff asserted breach of fiduciary duty and mismanagement, he refused to sit for deposition, and a default judgment was entered against him. He appealed, and we dismissed his appeal. See *800 South Wells Commercial LLC v. Gouletas*, No. 1-14-0781 (Nov. 6, 2014). Later, he filed a section 2-1401 petition (735 ILCS 5/2-1401 (West 2014)) to set aside this default judgment. The trial court denied his petition, he again appealed to our court, and we eventually dismissed his appeal for want of prosecution. See *800 South Wells Commercial LLC v. Gouletas*, No. 1-14-3214 (Apr. 2, 2015). Gouletas failed to pay the amount owed under the default judgment; a citation lien was issued, a contempt hearing was initiated, and before its conclusion, Gouletas filed for bankruptcy.

[5]Defendant later amended his motion for summary judgment.

in this appointment" but, rather, he "reported to the Manager (Gouletas)" and could only act with the unanimous approval of the members. With respect to the acquisition of the River City Complex, May attested that plaintiff was formed in order to obtain a leasehold interest in the commercial space and parking garage but not the marina. He confirmed that the Certificate directed defendant to amend the initial lease to remove the marina, that this was the decision of plaintiff's members, and that they approved this decision by unanimous vote. And, with respect to the option to purchase the parking garage from WRT, May attested that, although plaintiff asked defendant to discuss the option on its behalf, plaintiff knew that defendant was also discussing it on behalf of RCC (since he was RCC's vice president as well) and, ultimately, plaintiff's members were not interested in the option and did not instruct defendant to obtain it on plaintiff's behalf.

¶ 19    Gouletas's affidavit corroborated much of May's. Gouletas attested that he was plaintiff's manager, as well as a member. He stated that he appointed defendant as vice president of plaintiff in his capacity as plaintiff's manager and pursuant to section 5.9 of plaintiff's Operating Agreement and that defendant "was not granted status as a Manager in this appointment" but, rather, was to report to Gouletas, to act on his instructions as manager, and to perform actions unanimously approved by plaintiff's members. With respect to the River City Complex deal, Gouletas corroborated that the original lease included the commercial space, parking garage, and marina but that the lease was amended at the closing to include only the commercial space and parking garage and that this amendment to remove the marina from the deal was known to and approved by all of plaintiff's members. And, with respect to the option to purchase the parking garage, Gouletas confirmed that plaintiff asked defendant to discuss it with WRT on its behalf, with full knowledge that he was also discussing it on RCC's behalf and, ultimately, plaintiff did not want the option and did not instruct defendant to obtain it.

¶ 20    Defendant's affidavit corroborated those of May and Gouletas, with the additional attestations that he only acted as directed by plaintiff's manager and all of its members and that he never derived any direct or indirect benefit, personal or otherwise, from the transactions related to the marina or the parking garage option. In his deposition testimony, defendant was asked repeatedly if he believed he owed fiduciary duties to plaintiff. He stated that he believed his "role as an officer had some fiduciary responsibilities" but that, as far as duties, he had "[o]nly the authority that would be granted to [him] by the manager and the members." When pressed further as to what these duties entailed, he again stated that it would be "[w]hatever duties were specifically outlined in the certificate of authority" and "[w]hatever the oral and written instructions were from the manager." When asked if he believed he had a duty to do anything above and beyond what the manager authorized him to do, he responded, "[n]o."

¶ 21    With all this evidence and acknowledging that the parties were present on cross-motions for summary judgment, the trial court began its analysis by first determining whether defendant owed a duty to plaintiff. Citing the Operating Agreement and the Certificate as presented in this cause, as well as the Limited Liability Company Act (Act) (805 ILCS 180/1-1 *et seq.* (West 2014)) and *Katris v. Carroll*, 362 Ill. App. 3d 1140 (2005), the court concluded that defendant did not owe any fiduciary duty to plaintiff. The court found this was "clear" since the Act, as supported by the evidence, specifies that the manager of a manager-managed limited liability company has the authority and defendant was not the manager of plaintiff. In other words, the court explained, defendant "acted in accordance with the certificates of

- 6 -

authority" and "was operating within the operating agreement but not exercising the managerial authority such that he would be individually liable for [any] breach of fiduciary duty."

¶ 22 Noting that it would generally end its discussion at this point, the court continued its analysis to discuss breach, since it found "important to also point out other areas where [it] believe[d] that the evidence overwhelmingly supports again ruling in favor of [defendant]." Again "looking at the evidence," the court found that it "overwhelmingly supports that there was not a breach by [defendant]." Accordingly, the court granted summary judgment in favor of defendant and against plaintiff and denied plaintiff's cross-motion for summary judgment.

¶ 23                                           ANALYSIS

¶ 24 Plaintiff raises two contentions on appeal. First, it asserts that the trial court erred in granting summary judgment for defendant where the evidence raised a question of fact regarding whether he exercised a sufficient degree of managerial control over plaintiff's affairs so as to permit a finding that he owed fiduciary duties to plaintiff. Second, it asserts that the trial court erred in granting summary judgment for defendant where the evidence raised a question of fact regarding whether defendant breached fiduciary duties owed to plaintiff. We disagree with both assertions.

¶ 25 As we have noted, this cause was decided within the context of cross-motions for summary judgment. The mere filing of such cross-motions does not mean that there are no issues of material fact, nor does it obligate the trial court to enter summary judgment. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. However, in such an instance, the parties agree that only a question of law is involved and "invite the court to decide the issues based on the record." *Pielet*, 2012 IL 112064, ¶ 28.

¶ 26 Generally, summary judgment should be granted when the pleadings, affidavits, depositions, and admissions of record, construed strictly against the moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Pielet*, 2012 IL 112064, ¶ 29; *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001). Thus, the moving party has the initial burdens of proof and production to show that there is no genuine issue of material fact. *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 10. Once the moving party has met these burdens, the burden then shifts to the nonmoving party. *Triple R Development, LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 12. While it need not prove its case at this preliminary stage, the nonmoving party must, nevertheless, present some factual basis to support its claim, and it is not simply entitled to rely on the allegations in its pleading in order to raise a genuine issue of material fact. *CitiMortgage, Inc. v. Bukowski*, 2015 IL App (1st) 140780, ¶ 19; *Rucker v. Rucker*, 2014 IL App (1st) 132834, ¶ 49; see also *Winnetka Bank v. Mandas*, 202 Ill. App. 3d 373, 387-88 (1990) (nonmoving party must submit affidavits or rely on depositions or other admissions of record which counter the facts; it has a duty to present a factual basis which would arguably entitled it to judgment in its favor based on the law). This basis must recite facts and not mere conclusions or statements based on information and belief. *In re E.L.*, 152 Ill. App. 3d 25, 31 (1987); *Cohen v. Washington Manufacturing Co.*, 80 Ill. App. 3d 1, 3 (1979); see also *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010) ("nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law"). Ultimately, although summary judgment has been called a "drastic measure," it is an

appropriate tool to employ in the expeditious disposition of a lawsuit in which " 'the right of the moving party is clear and free from doubt.' " *Morris*, 197 Ill. 2d at 35 (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)). Appellate review of a trial court's grant of summary judgment is *de novo* (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)), and reversal will occur only if we find that a genuine issue of material fact exists (*Addison v. Whittenberg*, 124 Ill. 2d 287, 294 (1988)).[6]

¶ 27     In the instant cause, we find that summary judgment was properly entered in favor of defendant, as there was no genuine issue of material fact. This is because plaintiff failed to present any evidence to dispute that defendant was not plaintiff's manager nor exercised any managerial control over it and, as the evidence undoubtedly shows defendant did not owe plaintiff any fiduciary duties, he could not have breached any such duties.

¶ 28                                        I. No Fiduciary Duties Owed

¶ 29     Plaintiff contends that defendant owed it fiduciary duties for two reasons. First, it claims that by virtue of defendant's title of vice president, he owed such duties. It cites the common-law doctrine that an officer of a corporation owes fiduciary duties to that company and argues that neither the Act nor any agreement relevant to this cause was intended to supplant this consideration. Second, it claims that, even were this not so, defendant owed fiduciary duties because he exercised managerial control. For this, it cites certain portions of defendant's deposition, Cadle's testimony, and select phrases from the Operating Agreement. For various reasons and based on the evidence presented, plaintiff is incorrect on both fronts.

¶ 30     With respect to plaintiff's first claim, whether defendant owed it fiduciary duties as its vice president turns on three key documents that are intimately intertwined in this cause: the Act, plaintiff's Operating Agreement, and the Certificate.

¶ 31     It is undisputed that plaintiff was a manager-managed limited liability company, an entity formed under the Act and, therefore, statutorily governed. See *Katris*, 362 Ill. App. 3d at 1144 (limited liability companies are creatures of statute). In other words, and contrary to plaintiff's insistence, plaintiff is not a regular corporation such that common-law propositions concerning officers and their duties dominate this conversation or are even relevant. When dealing with limited liability companies and the fiduciary duties owed to them, we must look—first, foremost, and primarily—to the Act. See *Puleo v. Topel*, 368 Ill. App. 3d 63, 66-67 (2006) (we look to the provisions of the Act to determine the fiduciary duties owed to a limited liability company); accord *Katris*, 362 Ill. App. 3d at 1144. This is especially true where, as here, the Act speaks precisely to the instant issue—duties owed to the company. See *Katris*, 362 Ill. App. 3d at 1144. And, when a statute governs our discussion, it is well established that it is our duty to ascertain and give effect to the intent of the legislature via that statute's language, which, when clear, is the best indicator of legislative intent. *Puleo*, 368 Ill. App. 3d at 67; accord *Katris*, 362 Ill. App. 3d at 1145.

¶ 32     Section 15-1 of the Act differentiates between member-managed and manager-managed limited liability companies. In the latter, which describes plaintiff, the manager, alone, is responsible for the "management and conduct of the company's business," and he,

_____

[6]*De novo* review is also appropriate here, as we will discuss later, to the extent that this cause turns on the construction of provisions of the Act, a matter which presents a question of law. See *Pielet*, 2012 IL 112064, ¶ 30.

"exclusively," decides any matter relating to the company's business. 805 ILCS 180/15-1(c) (West 2014).[7] Thus, fiduciary duties owed to the company reside in him. See *Katris*, 362 Ill. App. 3d at 1146. This is not true of the company's members. Section 15-3(g)(1) makes clear that "a member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member." 805 ILCS 180/15-3(g)(1) (West 2014).

¶ 33    In the instant cause, Gouletas was the sole manager of plaintiff, a manager-managed limited liability company. Accordingly, pursuant to section 15-1 of the Act, it is Gouletas who owed fiduciary duties to plaintiff, not defendant. Moreover, not only was defendant not plaintiff's manager, but he was not even one of its members. The record is clear that plaintiff's only members were Gouletas and RCI (represented by May). Thus, even under section 15-3(g)(1), defendant could not owe any fiduciary duties to plaintiff simply by his office as its vice president.

¶ 34    In further support, section 15-5 of the Act allows a limited liability company to "enter into an operating agreement to regulate the affairs of the company and the conduct of its business and to govern relations among the members, managers, and company." 805 ILCS 180/15-5(a) (West 2014) (the Act applies to the extent that the company's operating agreement does not, to fill in any gaps). Such an operating agreement, then, comes to control. See *Katris*, 362 Ill. App. 3d at 1146-47. In the instant cause, plaintiff was formed by and operated under its Operating Agreement. In line with the Act, its Operating Agreement specified that plaintiff's manager, Gouletas, was empowered with "the sole and exclusive right to manage" plaintiff and permitted him to appoint officers. The responsibilities of these officers were detailed in section 5.9:

> "The Managing Member shall elect officers ('Officers') to carry out the policies and objectives of the Managing Member. Subject to the policies and objectives prescribed by the Managing Member, the Officers shall establish operating procedures for, and administer and direct, the day to day operations of the Company. The powers of the Officers may be broadened or limited from time to time in the discretion of the Managing Member and each Officer shall, at a minimum, be empowered to carry out (and shall carry out) any activity expressly authorized in a written resolution of the Managing Member. *** Each Officer shall serve until removed by the Managing Member. The Managing Member may remove any Officer at any time for any reason. *** No Officer shall receive any compensation for such Officer's services to the Company."

Clearly, while the officers were charged with certain duties, including day-to-day operations, these were exclusively controlled by the manager, Gouletas. Defendant could do nothing without the express consent of the manager and as the manager prescribed.

¶ 35    This was particularly true with respect to transactions underlying this cause, namely, the parking garage option that was eventually granted to RCC and possession of the marina. In conjunction with the Act and plaintiff's Operating Agreement, the Certificate, as executed unanimously by plaintiff's manager and all its members, appointed defendant to be plaintiff's vice president "in accordance with the provisions of Section 5.9 of the Operating Agreement."

---

[7]Subsection 15-1(d) lists those limited instances in which the manager must obtain the consent of all the members, such as when an operating agreement is to be amended or when the company is to sell or lease its property, but these are not at issue in this cause.

It further ordered him, on behalf of plaintiff, to acquire the leasehold interest in only the commercial space and the parking garage, as had been described in its Operating Agreement, pursuant to a leasehold purchase and sale by assignment agreement. The Certificate, then, just as the Act and the Operating Agreement, clearly dictated defendant's actions and prohibited him from doing anything not unanimously ordered by plaintiff's manager and members.

¶ 36     Having provided no valid legal support for its claim, the relationship of these three cohesive and governing documents necessarily defeats plaintiff's insistence that, by mere virtue of defendant's title of vice president, he must have owed it fiduciary duties.

¶ 37     First, plaintiff asserts that the Act was not intended to supplant the common-law concept that an officer of a corporation owes a fiduciary duty to that corporation. This could not be further from the truth. Undoubtedly, the Act governs here, not any common-law considerations, since the Act speaks directly to who, and who does not, owe fiduciary duties in the particular and specific context of manager-managed limited liability companies. See *Katris*, 362 Ill. App. 3d at 1144-45. While an officer of a corporation may well be tagged with fiduciary duties, our legislature has created limited liability companies and given them the power, through the Act and in conjunction with an operating agreement and other documents, to direct themselves as they see fit. In the instant cause, plaintiff was formed under the Act and governed by its unanimously adopted Operating Agreement, which specifically placed all power, and duties owed, in the hands of its manager—not in any members nor in any officers. As clarified in the Certificate, defendant was not the manager nor even a member. That he held the title of vice president, then, is irrelevant. Pursuant to the Act, the Operating Agreement, and the Certificate, defendant owed no fiduciary duties to plaintiff.

¶ 38     The evidence plaintiff points to in support of its claim that defendant's title imposed fiduciary duties is wholly unavailing. As noted earlier, in order to defeat defendant's motion for summary judgment, although plaintiff was not required to prove its case, it was required to present some factual basis to support it. See *CitiMortgage, Inc.*, 2015 IL App (1st) 140780, ¶ 19; *Morrissey*, 404 Ill. App. 3d at 724 ("nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law"). The only evidence plaintiff presented was defendant's title as vice president, that portion of the Operating Agreement stating that he was in charge of plaintiff's "day to day operations," and select snippets of defendant's deposition. However, we have already discussed that defendant's title is irrelevant here; the Act makes clear that the manager of a manager-managed limited liability company, not its officers nor even its members, are responsible for any fiduciary duties, and the Operating Agreement solidified this with respect to plaintiff in particular in this cause. Moreover, we have also already noted that, while plaintiff handily cites that portion of the Operating Agreement stating that defendant was charged with the "day to day operations" of plaintiff as an officer, it conveniently ignores the remainder of that section, which specifies he does this only "[s]ubject to the policies and objectives prescribed by the Managing Member." Contrary to the picture plaintiff attempts to paint, the entirety of section 5.9 of the Operating Agreement certifies that defendant had no free rein in any respect as vice president to control plaintiff; the Operating Agreement charged him with carrying out exactly, and only, what the manager ordered.

¶ 39     The same is true with respect to those portions of defendant's deposition plaintiff highlights, of which we feel the need to make special mention here. That is, plaintiff cites a few short phrases from defendant's otherwise lengthy deposition testimony wherein his response to a general question of whether he believed he owed fiduciary duties to plaintiff was that he

- 10 -

believed his "role as an officer had some fiduciary responsibilities." Plaintiff essentially hangs its hat on this one phrase. However, when defendant's deposition is read as a whole, plaintiff's presentation of his testimony becomes a prime example of evidentiary cherry-picking.

¶ 40　　The record reveals that, following that general deposition question cited by plaintiff, defendant was asked directly about what his precise fiduciary duties were as vice president. Defendant expressly responded that he had "[o]nly the authority that would be granted to [him] by the manager and the members." When further pressed, he again stated that his only responsibilities were "[w]hatever duties were specifically outlined in the certificate of authority" and "[w]hatever the oral and written instructions were from the manager." And, when asked if he believed he had a duty to do anything above and beyond what the manager authorized him to do, he expressly responded, "[n]o." His deposition was clearly in line with his affidavit, in which he attested that he acted only as directed by plaintiff's manager and all of its members. These repeated clarifications by defendant in his deposition testimony hardly incline us to interpret his cited statement, as plaintiff would otherwise have us, as an admission that he owed plaintiff fiduciary duties as its vice president.

¶ 41　　From all this, it is obvious that plaintiff's claim that defendant owed it fiduciary duties by virtue of his title as vice president inherently fails and, thus, summary judgment in favor of defendant was appropriate.

¶ 42　　Plaintiff, however, goes on to allege that, apart from his title, defendant also owed it fiduciary duties because he exercised managerial control over the company. For this second contention, plaintiff relies on section 15-3(g)(3) of the Act, as well as certain portions of the record, to insist that, at the very least, its claim raised a question of fact for the trial court. However, this assertion is entirely incorrect.

¶ 43　　Before analyzing this second contention, we must note, as defendant does, that procedurally, plaintiff is actually prohibited from making this argument on appeal. That is, it is axiomatic that summary judgment motions are limited to the issues raised in the complaint, and a plaintiff cannot raise new issues not previously pled in its complaint in order to obtain, or defeat a motion for, summary judgment. See *Filliung v. Adams*, 387 Ill. App. 3d 40, 51-52 (2008) (purpose of complaint is to crystallize issues in controversy; when ruling on motion for summary judgment, trial court looks to complaint to determine issues in controversy, and if party does not seek to amend with new issues, it cannot raise those issues later); accord *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 373 Ill. App. 3d 895, 900 (2007) ("A party cannot seek summary judgment on a theory that was never pled in the complaint.").

¶ 44　　Here, in its operative (fourth amended) complaint, plaintiff never asserted that defendant owed it fiduciary duties based on any alleged managerial control he exercised over it. Rather, the record is clear that plaintiff only, and exclusively, claimed that defendant owed it fiduciary duties because he held the title of vice president. In count I, the sole count directed against defendant, plaintiff simply states that defendant "as the vice president of Plaintiff[ ] owed fiduciary duties to Plaintiff." With respect to any allegations of fiduciary duty owed based on managerial control, plaintiff did briefly assert these in its complaint—but only against Gouletas, when it alleged that Gouletas "as *** control person of Plaintiff[ ] owed fiduciary duties to Plaintiff." Also, like its complaint, plaintiff's cross-motion for summary judgment only argued that defendant owed a fiduciary duty to his employer (plaintiff) because he was a

corporate officer (vice president).[8] Instead, it was not until plaintiff responded to defendant's motion for summary judgment that it first raised this concept of fiduciary duties owed due to managerial control specifically as against defendant. Thus, having not properly raised an allegation against defendant of his liability based on his alleged managerial control, plaintiff cannot argue it now on appeal. See *Filliung*, 387 Ill. App. 3d at 51-52; *Steadfast*, 373 Ill. App. 3d at 900.

¶ 45 However, even were we to address plaintiff's alternative theory here, we would find that it cannot stand, as the evidence it presents in support of this allegation regarding defendant's alleged managerial control would not have precluded summary judgment.

¶ 46 In support for its assertion, plaintiff redirects us to section 15-3(g) of the Act. Glossing past that subsection we have already discussed, which states that a member who is not also a manager does not owe a fiduciary duty to a limited liability company (805 ILCS 180/15-3(g)(1) (West 2014)), plaintiff cites subsection (g)(3), which states that "a member who exercises some or all of the authority of a manager" may be held to owe a fiduciary duty to that company. 805 ILCS 180/15-3(g)(3) (West 2014). Then, plaintiff again references the same snippets of defendant's deposition testimony, a statement from its new representative Cadle, and the same portion of section 5.9 of the Operating Agreement stating that he was to "establish operating procedures for, and administer and direct, the day-to-day operations" of plaintiff to argue that it sufficiently demonstrated to the trial court facts supporting that defendant exercised managerial control over it under this subsection. However, plaintiff's claim still misses the mark.

¶ 47 Plaintiff is correct that subsection (g)(3) of section 15-3 of the Act allows, for lack of a better term, an exception to the rules that in a manager-managed limited liability company, only the manager owes fiduciary duties. Essentially, subsection (g)(3) states that fiduciary duties can be imposed on someone else. However, that someone else, as this subsection specifies, must be "a member who exercises some or all of the authority of a manager." 805 ILCS 180/15-3(g)(3) (West 2014). Accordingly, this person must, first, be a member and, second, exercise the same control and authority as the manager.

¶ 48 While this is an interesting legal concept, it does not apply to the instant cause. Contrary to plaintiff's insistence, before we even get to an examination of whether defendant exercised some or all of the same managerial control as plaintiff's manager, we cannot forget that defendant was not, nor ever has been, a member of plaintiff. The record makes this clear, and plaintiff never disputes this. Therefore, section 15-3(g)(3) is inapplicable.

¶ 49 Moreover, even were we to somehow, and for whatever unfathomable notion, be able to construe him as a member, we cannot say that plaintiff raised a genuine issue of material fact demonstrating that he exercised the required managerial control described in section 15-3(g)(3) so as to hold him responsible for any fiduciary duties. The only evidence plaintiff provides in support of this is the same evidence it cited for its former proposition regarding defendant's title as vice president—the same evidence we have already found to be unavailing.

---

[8]Although the introductory paragraph of plaintiff's motion stated that defendant owed it a fiduciary duty because he was a vice president "who exercised managerial control over numerous aspects" of the company, the actual allegations it argued in the body of that motion center solely on his title, and the only count therein claims solely that defendant is liable for breaching his fiduciary duties "as vice president."

- 12 -

There is no need for us to again go over its same selectively chosen (and partial) quotations from defendant's deposition nor the same conveniently cherry-picked phrases from the Operating Agreement which plaintiff presents as its indication of defendant's managerial control. And, its additional citations to statements from Cadle's deposition do little to turn the tide here. Cadle, the representative for plaintiff's new manager DJV upon Gouletas's ouster, testified that, while it was known that Gouletas was plaintiff's manager, defendant "acted as and ran most of [Gouletas's] companies." Yet, we fail to see the impact here. Cadle never provided any documentary evidence to support his testimony. Nor was he a manager or member of plaintiff, or any Gouletas company, during defendant's tenure as plaintiff's vice president. Also, the record reveals that it was widely known among all of Gouletas's companies, and specifically among all of plaintiff's members, that defendant was not only plaintiff's vice president but he held different roles in other companies owned and managed by Gouletas; no one ever disputed this. And, most critically, even accepting Cadle's statement that defendant "ran" other Gouletas-related companies, this is no indication that defendant "ran," or in any way exercised managerial control, over plaintiff specifically. To the contrary, we have already discussed at length that plaintiff's own Operating Agreement and Certificate directly refute that suggestion. And, in addition to defendant's own deposition testimony and affidavit, there are the affidavits of Gouletas (plaintiff's manager) and May (plaintiff-member RCI's agent). Both of them stated that defendant was never granted the status of manager in any respect and could only act with the unanimous approval of plaintiff's manager and members. They corroborated that defendant had absolutely no managerial authority.

¶ 50    Accordingly, and just like its initial claim regarding defendant's title as vice president, it is clear that plaintiff's new and alternative assertion that defendant is liable for fiduciary duties stemming from his alleged managerial control over plaintiff was properly disposed of via summary judgment.

¶ 51    Our determination on both these fronts is expressly supported by *Katris*, a case we find to be directly on point, despite some minor factual differences. In *Katris*, four men—Doherty, Szlendak, Hamburg, and Katris—formed a manager-managed limited liability company, like plaintiff here, named Viper Execution Systems, L.L.C. (Viper), with the purpose of adopting and executing a computer software program Doherty had written. Hamburg and Katris were the company's sole managers, and Doherty and Szlendak were members. They unanimously adopted an operating agreement, which stated that the company's business affairs were to be managed exclusively by its managers. The operating agreement also enumerated the rights and obligations of its members. No provision of the operating agreement gave the members (Doherty and Szlendak) any managerial authority. The four men then elected Hamburg as the company's chief executive officer, Katris as its chief financial officer, Szlendak as its director of marketing, and Doherty as its director of technical services. *Katris*, 362 Ill. App. 3d at 1142-43.

¶ 52    Doherty, meanwhile, was working as an independent contractor for another company, Ernst & Company (Ernst), also involving computer programming tasks. He was eventually hired to work there with employee Patrick Carroll, and as part of his duties for that company, he collaborated with a programmer to adapt a software program, which turned out to be very similar to the one he had developed for Viper. *Katris*, 362 Ill. App. 3d at 1143.

¶ 53    Just as in the instant cause, Katris brought suit against Doherty for breach of fiduciary duties and against Doherty, Carroll, and Ernst for collusion. Katris claimed that Doherty had

- 13 -

usurped a corporate opportunity belonging to Viper (by effectively "stealing" the software program and giving it to Ernst) and that Carroll and Ernst colluded with Doherty to breach his fiduciary duties to Viper. Doherty eventually settled with Katris, leaving only the collusion claim as against Carroll and Ernst. Carroll and Ernst moved for summary judgment, asserting that Katris's collusion claim must fail because Doherty, as a nonmanager-member of the manager-managed Viper, did not owe Katris or Viper a fiduciary duty and, thus, they could not have colluded with him to breach it. Katris countered that, by virtue of Doherty's title as director of technology and his work as such, he had the sole managerial responsibility under the operating agreement for adapting the software for Viper and thus, under the Act, he was subject to the same standards as a manager and owed fiduciary duties. The trial court, just as the trial court herein, granted Carroll and Ernst's motion for summary judgment. *Katris*, 362 Ill. App. 3d at 1143-44.

¶ 54    On appeal, we affirmed. At the outset, we noted that this cause depended upon a finding that Doherty owed Katris and Viper a fiduciary duty. *Katris*, 362 Ill. App. 3d at 1144. To determine this, we turned immediately to section 15-3(g) of the Act. *Katris*, 362 Ill. App. 3d at 1144 (limited liability companies are creatures of statute and governed by the Act). Katris conceded that Doherty did not owe Viper any fiduciary duties solely by reasons of being a member of the company; he acknowledged that section 15-3(g)(1) made clear that a member of a manager-managed limited liability company owes no such duties in that capacity. *Katris*, 362 Ill. App. 3d at 1144. Katris, however, much as plaintiff herein, cited section 15-3(g)(3), contending that Doherty exercised some of the authority of a manager in his capacity as director of technology for Viper and, thus, qualified as a " 'member who pursuant to the operating agreement exercises some or all of the authority of a manager in the management and conduct of the company's business' " so as to make him liable. *Katris*, 362 Ill. App. 3d at 1144-45 (quoting 805 ILCS 180/15-3(g)(3) (West 2002)).

¶ 55    Looking at the plain language of section 15-3(g)(3), we disagreed. We noted that the Act permitted a limited liability company to enter into an operating agreement to regulate the company and govern the relations among its members, which Viper had done. *Katris*, 362 Ill. App. 3d at 1145. In that operating agreement, which controlled the matter, it specifically provided that Viper's business and affairs were to be managed solely by its managers (Hamburg and Katris), and no provision provided for any managerial authority to extend to its members (Szlendak and Doherty). *Katris*, 362 Ill. App. 3d at 1145. Pursuant to the operating agreement, then, Doherty did not exercise any managerial authority. *Katris*, 362 Ill. App. 3d at 1145.

¶ 56    Additionally, we further examined Katris's assertion that, apart from his title as director of technology, Doherty otherwise exercised managerial control which made him liable for fiduciary duties owed. For example, we noted that Katris had enumerated in an affidavit all the ways he believed Doherty allegedly exercised such managerial authority over Viper. However, our court, made clear that, under section 15-3(g), we were bound to the contents of the operating agreement. *Katris*, 362 Ill. App. 3d at 1146-47 ("To look beyond the operating agreement to Katris' affidavit would be to ignore the plain meaning of the statute and to render the express words used therein superfluous or meaningless. This we cannot do."). And, as a member who was explicitly not granted any managerial authority under that operating agreement, Doherty could owe no fiduciary duties to Viper or Katris, and in turn, Katris's collusion claim against Carroll and Ernst necessarily failed. *Katris*, 362 Ill. App. 3d at 1147.

¶ 57    The instant cause mirrors *Katris* in several important respects and merits the same result. First, defendant's title as vice president, just as Doherty's title as director of technology, is meaningless with respect to fiduciary duties. This is because, just as Viper, plaintiff was a manager-managed limited liability company governed by the Act that adopted an operating agreement providing that its manager maintained sole and exclusive authority to manage and conduct its business. Just as Doherty, defendant was not that manager. Moreover, and just as we additionally found with Doherty, defendant here was not a "member who pursuant to the operating agreement exercises some or all of the authority of a manager in the management and conduct of the company's business" so as to make him liable under section 15-3(g)(3) of the Act. As we have discussed at length, the evidence presented proves otherwise: section 5.9 of the Operating Agreement and the Certificate relegated defendant to perform his assigned tasks subject entirely to the behest of plaintiff's manager and only upon his resolutions, and the affidavits of defendant, Gouletas, and May, along with defendant's deposition testimony that he had no managerial authority, remained unrebutted by plaintiff. Interestingly, in *Katris*, Doherty was actually a member of Viper, and yet, our court still found he owed no fiduciary duty to the company under section 15-3(g)(3). Here, we are even one step removed; defendant was neither the manager nor a member of plaintiff.

¶ 58    Plaintiff counters the clear applicability of *Katris* to the instant cause with a citation to *Tully v. McLean*, 409 Ill. App. 3d 659 (2011), a case that is wholly distinguishable. Briefly, in *Tully*, a member of a member-managed limited liability company brought suit for fraud and breach of fiduciary duty against the company, the original member-manager, the successor member-manager, two other members, and the former property manager. After a bench trial, the trial court awarded the plaintiff-member over $4 million in damages, and our court affirmed. We did so because, not only did we find that the defendants' business conduct was flagrant and in willful disregard of the plaintiff's rights as a member but also, and significantly, because, based on the facts, the fiduciary relationship between the plaintiff and the defendants in this member-managed company could not be denied. *Tully*, 409 Ill. App. 3d at 682-83. We pointed out that, while "[n]ormal trust between contracting parties does not turn a contractual relationship into a fiduciary one," the "trust" between the parties in *Tully* was "more than normal trust." *Tully*, 409 Ill. App. 3d at 683 ("The essence of a fiduciary relationship is that one party is dominated by another; the presence of a significant degree of dominance and superiority."). Specific to that cause, there was a huge degree of control exercised among the parties during their business relationship, as the plaintiff was completely dependent upon the defendants to run the company and had given up all control to the defendants, and the defendants—the fiduciaries—participated in a complex "web" of schemes that siphoned money away from the company and its members for many years. *Tully*, 409 Ill. App. 3d at 683.

¶ 59    *Tully* is inapposite here, and plaintiff's reliance on it is misplaced. Unlike that case, the instant cause does not deal with a member-managed limited liability company nor with a member at all. More critically, the dominance and superiority exhibited in *Tully* are not remotely found herein. Unlike those defendants, defendant in the instant cause was simply an officer, one who specifically was not in control of any facet of the company. As we have discussed, he had no power to do anything without the direction of the manager; by the Act, plaintiff's own Operating Agreement and the Certificate, his hands were tied. And, in direct contrast to *Tully*, plaintiff was not at all dependent on defendant to run the company; that duty fell directly, and solely, to its manager who governed the business as well as the contents and

- 15 -

duration of defendant's employment as its officer. Thus, we find no reason to depart from our holding in *Katris*, which, unlike *Tully*, is completely applicable here.

¶ 60    Ultimately, the evidence clearly demonstrates that defendant acted within the Act, the Operating Agreement, and the Certificate. Accordingly, we find that summary judgment in his favor was proper since, because he had no managerial authority, via his title or otherwise, he could not have owed any fiduciary duties to plaintiff.

¶ 61                              II. No Breach of Fiduciary Duty

¶ 62    Although it found that defendant owed no fiduciary duty to plaintiff, the trial court in the instant cause extended its holding to state that, even if he did owe such a duty, summary judgment in his favor was still warranted because the evidence "overwhelmingly supports that there was not a breach."

¶ 63    Plaintiff contends that this was incorrect in two respects. First, it claims that defendant breached his fiduciary duty by purposely diverting the parking garage option away from plaintiff and to RCC, thereby stripping plaintiff of this asset, taking the collateral from its second mortgage, and leaving plaintiff owing on this mortgage without any way of repaying it. Second, it claims that defendant breached his fiduciary duty by underhandedly trading out the marina from the River City Complex deal for no compensation. Plaintiff asserts that the evidence it presented in regards to these claims raised a question of fact that the trial court should have addressed.

¶ 64    However, we find, based on the evidence presented, that even if, counter to our finding, defendant did owe plaintiff a fiduciary duty (either as its vice president or because he exercised managerial control), the evidence does not remotely demonstrate that he breached that duty and, thus, summary judgment was proper.

¶ 65    To state a claim for breach of fiduciary duty, a plaintiff must set forth facts showing that a fiduciary relationship existed between the parties, that the defendant breached the fiduciary duty, and that the breach proximately caused the injury of which the plaintiff complains. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). A fiduciary relationship imposes upon the fiduciary a general duty not to obtain self-benefits during the relationship. *Neade*, 193 Ill. 2d at 440. For example, and relevant to the instant cause, the fiduciary is obligated to first disclose potential opportunities to the company and is prohibited from taking advantage of business opportunities that belong to the company. *Goldberg v. Michael*, 328 Ill. App. 3d 593, 599 (2002). Such opportunities are ones in which the company has the capacity to engage and are reasonably incident to the company's present or future business prospects. *Anest v. Audino*, 332 Ill. App. 3d 468, 478 (2002).

¶ 66    With respect to the parking garage option, defendant, assuming he owed a fiduciary duty to plaintiff, did not breach that duty, for various reasons. First, the parking garage option was not an opportunity in which plaintiff had the opportunity to engage. As noted earlier, plaintiff's Operating Agreement stated that it "shall engage in no other business until such time as the First Mortgage and Second Mortgage *** have been repaid in full." At the time WRT became interested in purchasing plaintiff's commercial space but not the parking garage, plaintiff had two mortgages—one with Parkway Bank and a second with CIB Bank. When WRT proposed the consent foreclosure and the idea of an option to purchase the parking garage, this deal, as all the parties agree, was with respect to the first mortgage only. Following the consent foreclosure, then, plaintiff was still in debt; the second mortgage it owed to CIB Bank was still

alive, and plaintiff was in default on it. Therefore, pursuant to its own Operating Agreement, plaintiff could not engage in any business—including obtaining the parking garage option.

¶ 67 Moreover, defendant did not divert the parking garage option from plaintiff because, contrary to plaintiff's insistence, the option in no way was reasonably incident to its business prospects. This rests directly upon the contents and meaning of Px1, the document prepared by WRT. In Px1, WRT wrote that it would "grant the borrower (or another group) the option to buy the indoor 133 parking spaces." But Px1 was never signed nor dated by WRT or anyone else, and it never specified what entities were involved in the potential option agreement. Indeed, when plaintiff sued River City Parking, which eventually acquired the parking garage via a written option with WRT, for aiding and abetting defendant's alleged breach of fiduciary duties, the trial court granted River City Parking's motion to dismiss. The court specifically found that Px1 was never a firm agreement between plaintiff and WRT for the option but, rather, only "a term sheet that indicates further discussion is necessary" and one that did not grant anyone—let alone plaintiff—the sole option to purchase. See *800 South Wells Commercial, LLC v. Gouletas*, No. 11-L-2895 (Cir. Ct. Cook County, July 11, 2014). Plaintiff never appealed this determination. See *Perik v. JPMorgan Chase Bank, N.A.*, 2015 IL App (1st) 132245, ¶ 30 (resolution of issue in prior appeal becomes binding and controlling, regardless of whether it is question of law or fact). Likewise, in his deposition testimony in the instant cause, plaintiff's own representative Cadle, when specifically asked about the option agreement, admitted that Px1 was never signed by anyone, did not specify it was between certain companies, and critically, that its phrase "we will grant the borrower or another group the option" to purchase did not necessarily mean plaintiff. From all this, it is clear that that the parking garage option never even belonged to plaintiff and, thus, defendant could not have breached a fiduciary duty with respect to it.

¶ 68 The same is true regarding the marina. The evidence presented in this cause clearly indicates that defendant did not breach any fiduciary duties with respect to the marina because there were no business opportunities relative to the marina which defendant could have breached. As indicated at the outset of our decision here, the River City Complex, which started this all, was an area made up of five components: an apartment complex, the commercial space, a surface parking lot, the parking garage, and the marina. Just as the apartment complex and the surface parking lot, the marina was not intended to be part of plaintiff's assets. Pursuant to its Operating Agreement, plaintiff was specifically formed with the purpose of obtaining a leasehold interest in "the Property." The Operating Agreement explicitly defined "the Property" as "the property located at 800 South Wells Street, Chicago, Illinois, generally consisting of approximately 240,000 square feet of net rentable commercial space and approximately 130 indoor parking spaces in the building located on the Property." The marina clearly was never intended to be included as part of the property that plaintiff was meant to obtain. This is further supported by the Certificate, which was unanimously issued by plaintiff's manager and members to effectuate the Complex deal. The record indicates that, originally, the lease negotiated between plaintiff and Invesco (which owned the Complex) included rights to the marina. However, that lease was amended by plaintiff's manager and members to separate out the marina and remove it from the deal, thereby creating what the parties referred to as an amended lease. The Certificate then specifically ordered and directed defendant to approve the amendment to the lease and proceed with the deal—for the commercial space and parking garage ("the Property") and without the inclusion of the marina.

Both May and Gouletas attested that defendant was directed to amend the initial lease to remove the marina pursuant to the unanimous vote of plaintiff's manager and members. Therefore, and without more on plaintiff's part here to rebut this evidence, we fail to see how defendant could be said to have breached his fiduciary duty with respect to a marina plaintiff was never intended to possess in any legal form.

¶ 69 The fact remains that neither the parking garage option nor the marina were business opportunities legitimately available or intended for plaintiff to pursue, such that defendant somehow breached a fiduciary duty with respect to them. Even if they were, there is no evidence in the record to show that defendant failed to disclose these to plaintiff or that he derived personal gain from his alleged diversion of them away from plaintiff. See, *e.g.*, *Goldberg*, 328 Ill. App. 3d at 599; *Elward v. Peabody Coal Co.*, 121 Ill. App. 2d 298, 307 (1970) (these factors indicate improper usurpation of business opportunities). To the contrary, May and Gouletas attested that plaintiff—its manager and all its members—unanimously voted to exclude the marina from its dealings and knew that defendant was discussing the parking garage option on behalf of both plaintiff, which eventually told defendant not to obtain it, and RCC, which eventually did obtain it. Add to this defendant's testimony that he discussed these things with plaintiff's counsel and never obtained any personal benefit from them, along with that section of plaintiff's Operating Agreement, which prohibited any officer from receiving "any compensation" for his services to plaintiff, and we find that there is no evidence showing that defendant, if he owed any, breached a fiduciary duty here.

¶ 70                                    CONCLUSION

¶ 71 Having found no evidentiary basis to demonstrate that defendant owed plaintiff any fiduciary duty or, alternatively, that he breached such a duty, we hold that summary judgment in favor of defendant here was proper. Accordingly, we affirm the judgment of the trial court.

¶ 72 Affirmed.